IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JENE ZARBANO and BRYON GAMBLE, | No. 4:11-cv-00406-RP-RAW |
| Plaintiffs, | |
| vs. | **REPORT AND RECOMMENDATION** |
| MARK LUND, Superintendent; STEVE JENKINS; SHAWN HOWARD; JIM PAYNE; ROXANNE PHILLIPS; DAYNA TAYLOR; RENEE WILLIAMS; JENNIFER HEGEWOOD; JOHN BALDWIN, Director of DOC; JERRY BURT, Deputy Director Eastern IDOC; DIANN WILDER-TOMLINSON, Deputy Director Western IDOC; FRED SCALETTA, IDOC Central Office; RON MULLEN, Superintendent; BETTY WITTE, PSSE; BARB WHEELER, Associate Warden of Administration; KRISTINE WEITZELL, Assistant Deputy Director; and MARY ROCHE, Director of DOC Victim & Restorative Justice Programs; | |
| Defendants. | |

Plaintiffs Jene Zarbano and Bryon Gamble are, respectively, former and current inmates of the Iowa Department of Corrections (IDOC). They brought this action under 42 U.S.C. § 1983, alleging their rights under the First and Fourteenth Amendments to the U.S. Constitution were violated when Iowa prison officials denied them all contact with their minor children based on their crimes involving sex offenses against minors. They seek injunctive and declaratory relief and damages. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(3). The named Defendants in the Amended Complaint [33] include administrators in the central office of IDOC, administrators

at Clarinda Correctional Facility (CCF) in Clarinda, Iowa, and administrators at the Mount Pleasant Correctional Facility (MPCF) in Mount Pleasant, Iowa. Defendants argue Mr. Zarbano's claims are moot, Mr. Gamble lacks standing, they did not violate Plaintiffs' federal constitutional rights, and they are entitled to qualified immunity. This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

On April 22 and 23, 2015, at the U.S. Courthouse in Des Moines, Iowa, the Court held an evidentiary hearing on the matters raised in the Amended Complaint. The parties submitted post-hearing briefs. The matter is fully submitted.

## I.  FINDINGS OF FACT

### A.    Jene Zarbano

Mr. Zarbano was convicted of third-degree sexual abuse of his stepson, and he served time on his sentence at CCF from July 30, 2010, until September 22, 2011. (Stip. [73] ¶ 16). He last had contact with his four minor children, J, W, P, and C, at the jail, before he was moved to CCF. While at CCF, Mr. Zarbano did not try to contact his children, but he did submit "kites" (a request form) and a grievance requesting he be allowed contact. Prison officials denied his requests because of his sex offense conviction. (*See id.* ¶¶ 19-21). Mr. Zarbano has not seen or heard from his children in over five years.

Mr. Zarbano was required to participate in the Sex Offender Treatment Program ("SOTP"). (Stip. [73] ¶¶ 18, 22). In September 2012 Mr. Zarbano was transferred to MPCF where the SOTP is administered. He successfully completed the program. When he first arrived at MPCF he was told he could write to his children until he started the treatment program. He sent a letter to his son, but it was returned undelivered. During the SOTP, Mr. Zarbano was not

allowed to attempt to contact his children. He does not know where they are. There is no evidence the children's mother would ever have allowed contact with them, or that the children, now ages 14-9, would be receptive to contact.

Mr. Zarbano discharged his sentence from MPCF in October 2014. He remains on supervision as a result of a lifetime special sentence (a form of lifetime parole) under Iowa Code §903B.1. (Stip. [73] ¶ 23).

**B**.     **Byron Gamble**

On February 29, 2008 Mr. Gamble pleaded guilty to second degree sexual abuse of the then-9-year-old daughter of a girlfriend with whom he was living. He received a 25-year prison sentence which he is currently serving at CCF. Mr. Gamble will be eligible for parole in 2025, and assuming he receives all of his earned time, he will discharge his sentence in 2029. (Stip. [73] ¶ 4). Like Mr. Zarbano, he will be subject to lifetime parole, and will be required to participate in the SOTP. He is not likely to be paroled until he completes the program. (*Id.* ¶¶ 7-8). Generally, the IDOC schedules the SOTP near the end of an offender's sentence in the belief it is likely to be most effective shortly before an offender is released, and resource limitations make it difficult to schedule the SOTP earlier.[1] It is estimated Mr. Gamble will begin the SOTP in 2027. (*Id.* ¶¶ 9-10).

---

[1] When a sex offender should participate in the SOTP was the subject of some dispute in the testimony. Plaintiff's expert, Dr. Luis Rosell, a clinical psychologist who directed Iowa's SOTP between 1998 and 2002, testified the ideal time for sex offender treatment is sooner rather than later from the time the offense occurred. It is best, he said, to treat while the offense is still fresh in the offender's mind rather than after many years during which the offender remains in the same frame of mind.

Mr. Gamble has a biological daughter, J.D., born in 1999. In 1998 Mr. Gamble and the child's mother, Aubrey Davey, lived together briefly in Florida. They were not married. The couple separated before J.D. was born and Mr. Gamble moved from Florida.[2] Mr. Gamble maintained contact.  When he returned to Florida seven months after J.D. was born he briefly visited Ms. Davey and his daughter. He held J.D. while Ms. Davey was in the room with him. He was in J.D.'s presence only this one time.

In 2005, when J.D. was about six years old, she asked if she had another daddy. Ms. Davey told J.D. about Mr. Gamble. Ms. Davey contacted Mr. Gamble through his family. Between 2005 and 2008. J.D. and Mr. Gamble were in regular contact by telephone and correspondence.

Mr. Gamble agreed to a termination of his parental rights to J.D. to facilitate a stepparent adoption by J.D.'s stepfather. According to Ms. Davey, Mr. Gamble agreed to the termination and adoption after Ms. Davey assured him they were not cutting him out of the family.

While at CCF, Mr. Gamble requested contact with J.D. by telephone, mail, and visits. (Stip. [73] ¶ 12). Prison officials have denied Mr. Gamble all contact with his daughter until he completes the SOTP (*id.* ¶ 13), but this was not the case early on. J.D. was approved to be on his visiting list. The two wrote regularly and spoke on the telephone every few months when Mr. Gamble was able to afford the cost. For a couple of years Mr. Gamble participated in the Angel Tree program.  The program arranges for donated gifts to be given to the children of offenders with a note from the offender. After some internal confusion, in 2010, and again in 2011, Mr.

---

[2] Ms. Davey married Jason Davey after her relationship with Mr. Gamble ceased. Davey is her current married name. The Daveys have been married about twelve years and have two children. J.D. resides with them in Florida.

Gamble's Angel Tree application was denied because of his sexual abuse offense with a minor. (*See* Exs. 7, 13, 19, 22). In the process, prison officials discovered that J.D. had mistakenly been placed on Mr. Gamble's visiting list, though it appears Ms. Davey (who would have accompanied J.D.) visited Mr. Gamble only once. (*See* Ex. 17).  Mary Roche, the IDOC Director of Victim and Restorative Justice Programs, was consulted and responded that until Mr. Gamble completed the SOTP he should not have any contact with minors. (Ex. 22 at 1). Mr. Gamble's complaints about his inability to participate in the Angel Tree program made in classification sessions and an appeal resulted in prison officials telling him that he could not communicate, correspond, or have visitation with J.D. until after he successfully completed the SOTP. (*See* Exs. 8, 9, 10, 11, 14). He was also told he could not pass messages to J.D. through her mother. Prison records indicate Mr. Gamble said he understood these restrictions. (Ex. 9). Mr. Gamble testified he believed the restrictions on his contact with J.D. were for visits and phone calls, and was not told he could have no communication with J.D. This is difficult to credit in view of the contrary indications in prison records.

In any event, Mr. Gamble continued to write to J.D. and receive letters from her until early 2015 when the correspondence came to the attention of prison officials. (*See* Stip. [73] at 3; Ex. 15). At first Mr. Gamble was told he could correspond with J.D.  (Ex. 15).  Later, in a March 2015 classification session with the same official (Sara Isaacson), Mr. Gamble was told he had been incorrectly advised and that he could not have contact with J.D.  A note in the classification record indicates Mr. Gamble stated he understood all correspondence with J.D. needed to stop. (Ex. 16). Apparently it has.

Fourteen letters from Mr. Gamble to J.D are in the record spanning a roughly five-year period between 2009 and 2014, (Exs. 38-40), as are three letters from J.D. to Mr. Gamble written in 2014 and 2015. (Exs. 38-40). More about their content later. Mrs. Davey testified she saw all of the letters between J.D. and Mr. Gamble, that she and J.D. read them together, and that they keep the letters in a notebook. Any phone conversations were by speakerphone so Mrs. Davey could listen. Mrs. Davey teaches in a middle school in Panama City, Florida. As a mandatory reporter of child abuse, she testified she knows the signs to look for in an abusive situation, but she has no reservations in allowing her daughter to have contact with Mr. Gamble. She stated she is aware of the details of Mr. Gamble's crime of conviction (she had access to court records), and she does not find conclusive evidence of his guilt. Neither she nor J.D. believe Mr. Gamble committed the crime. Ms. Davey testified Mr. Gamble never said anything inappropriate during the phone calls with J.D or in his letters to her. Mrs. Davey does not see how contact with J.D. could hurt J.D. At the time of hearing J.D. was a high school sophomore and had a job as a waitress.

Mr. Gamble testified that contact with J.D. is important to him because he is her father, and he thinks he can help instruct her behavior. Their relationship also benefits him in that it helps him stop thoughts of hurting himself. Mrs. Davey testified that J.D. was very upset when contact with her father stopped, and that they consider him as part of their family. Mr. Gamble communicates with Mrs. Davey's mother, and every two years her family visits his parents in Iowa. Ms. Davey testified she, with J.D., would like to visit Mr. Gamble and his family over the Thanksgiving holiday in 2016. The parties have stipulated that when J.D. turns eighteen, in

February 2017, IDOC policies will not restrict J.D.'s visitation, correspondence, or telephone communication with Mr. Gamble. (Stip. [73] ¶ 15).

**C.     Prison Policies**

The IDOC written policies are of two kinds: formal administrative rules adopted in conformity with the Iowa Administrative Procedure Act, Iowa Code Ch. 17A and set out in the Iowa Administrative Code (IAC); and internal department-wide administrative policies. (Stip. [73] ¶ 24). The IAC rules regarding mail and telephone contact for offenders do not address any particular restrictions on sex offenders or sex offenders whose offenses are with minors. (*Id.* ¶¶ 25-26). *See* Iowa Admin. Code R. §§ 201-20.4 (904)(mail), 201-20.20(904)(telephone). The IAC does address sex offender visitation with minors. *Id.* § 201-20.3(d)(904). Department-wide policies govern mail and telephone communication with minors, and concern visitation as well. How the policies operate with respect to sex offenders convicted of sexually abusing a child is summarized in Exhibit 64.

1.  Visitation

On the subject of visitation the IAC provides, in relevant part:

> d.   *A sex offender whose victim was a minor shall not be permitted to have any children on the offender's visiting list until the offender has completed the sex offender treatment program.* After the offender's completion of the treatment program, a minor victim of the offender may be added to the offender's visiting list only with the approval of the institutional treatment team and the victim and restorative justice administrator of the department. Other children may be added to the offender's visiting list after the offender's completion of the treatment program and approval of the institutional treatment team.

Iowa Admin. Code R. § 201-20.3(4)(d)(904) (emphasis added); Ex. 56 at 3.

The relevant portion of the IDOC policy on visitation, OP-MTV-04, prohibits sex offenders with minor victims from having visitation with children, regardless of whether the children are in the offender's immediate family, but exceptions can be made. (Stip. [73] ¶ 29; Ex. 77-1). Though there have been a number of amendments, since at least 2010 the policy has restricted sex offender visitation with minors. As it stands now, if a visitation "application includes minors (17 years of age or under)" the offender's criminal history is checked. "Minors shall not be approved visitation with an offender whose prior or current conviction involves a minor" until the offender successfully completes the SOTP. At that point visitation with the minor is subject to review and approval of the sex offender treatment team. The offender can appeal to the IDOC Office of Victim Programs and ultimately to the IDOC Director. (Ex. 77-1 [84-1] at 4-7). Factors to consider on appeal include "age of the applicant, relationship of the applicant to the direct victim, nature of the offense(s), offender's participation in treatment programming, [and] institution reports." (*Id.* at 7).

2. Telephone

Prior to July 2011 the IDOC departmental policy on telephone contact, Policy OP-MTV-3, did not specifically address sex offender telephone contact with minors. Since then the policy has been amended. Now, "[s]ex offenders with minor victims are prohibited from telephone contact with minors," regardless of whether the victim was in the offender's immediate family, but exceptions can be made. (Stip. [73] ¶ 28; Ex. 77-1 [84-1] at 2 (relevant portion); Ex. 77-2 [84-2] (whole policy)).

3. <u>Mail Correspondence</u>

Prior to January 2011, IDOC departmental Policy OP-MTV-01 on correspondence did not specifically address sex offender correspondence with minors. (Ex. 77-1 [84-1] at 1). In January 2011, the policy was amended to add the following paragraph:

> Sex offenders with minor victims are prohibited from corresponding with minors *outside their immediate family. Sex offenders with minor victims shall normally be allowed correspondence privileges with minors in their immediate family unless a victim of the current or previous offense is a member of the immediate family.* Exceptions may be approved by the IDOC Office of Victim Services in consultation with the Associate Warden of Treatment.

(Ex. 77-1 [84-1] (emphasis added); *see* Ex. 58 at 5). The policy defines "immediate family" as "[a]n offender's spouse, mother, father, sister, brother, child, grandparent, established legal guardian, or other who acted in place of parents and step or half-relation if the step or half-relation and the offender were raised as cohabiting siblings." (Ex. 58 at 2). [3]

The policy is open to some interpretation with respect to the identity of the relevant "immediate family" victims in Mr. Gamble's case. In his deposition IDOC Deputy Director of Operations (now IDOC Director), Jerry Bartruff, first testified that the policy would normally allow Mr. Gamble to correspond with J.D. because J.D. was not the victim and was not in the same household as the victim. (Bartruff Depo. [77] at 12-13). When Mr. Gamble's continuing correspondence with J.D. came to the attention of prison official Sara Isaacson she made a note that because Mr. Gamble's victim was not a member of the immediate family he was allowed to correspond with J.D, only two months later to tell Mr. Gamble she had been wrong about the

---

[3] An email chain in the record suggests that the 2011 amendments to the telephone and correspondence policies to more definitively address sex offender contact with minors may have been prompted by questions from CCF officials about Mr. Gamble's visitation with his daughter and a similar situation involving another offender. (Ex. 20)

policy. (Exs. 15, 16). As the Court understands the testimony of the IDOC Director of Victim and Restorative Justice Programs Mary Roche, she views Mr. Gamble as having two "immediate fami[ies]" for purposes of the policy. Because he lived in the same household with the girlfriend and child he abused, that living arrangement qualified as an immediate family. Ms. Davey and J.D. were a second immediate family. The sex abuse of a minor victim in the first immediate family thus prohibits Mr. Gamble from corresponding with a minor in the second immediate family even though the two "families" had nothing to do with each other. Later in his deposition Mr. Bartruff appeared to agree the policy could be interpreted as Ms. Roche views it. (Bartruff Depo. [77] at 37-38). In view of her position in the IDOC hierarchy, Ms. Roche is the key decision maker in interpreting policy issues pertaining to sex offender contact with minors.[4]

## D.      The SOTP and Recidivism

The SOTP is the primary rehabilitation tool for those convicted of serious sex abuse offenses in Iowa. The first step is a psychosexual evaluation of the offender. The process involves various kinds of administrative and psychological testing, including two objective measurements of the offender's recidivism risk; the Static-99 (now the Static-99-R, a revised version) and the Iowa Sex Offender Risk Assessment ("ISORA"). Both result in a statistical prediction of sex abuse reoffending based on historical recidivism rates for offenders with particular risk factors (ten factors in the case of the Static-99-R, six in the case of the current

---

[4]    The "immediate family" language in the mail regulation could reasonably be interpreted as restricting correspondence only if the minor was in the immediate family in which the abuse occurred. This would accord with the evident purpose of the restriction to protect minors in the family who may have some knowledge of or connection to the abuse, or potentially may be an undisclosed victim. Whether prison officials have misinterpreted the mail regulation is not the issue. The Court is only concerned with the federal constitutional implications of their application of the regulation.

ISORA).  (*See* Exs. 41, 61 at 18).[5] The recidivism data includes sex offenders, regardless of the age of the victim, child or adult. Both assessment measures proceed from a recidivism base rate. The base rate is the number of sex offender recidivists (new convictions) divided into the total number of convicted sex offenders over a sample period. The result is the gross historical percentage of sex offenders who are convicted of a subsequent sex abuse offense. The most recent base rate for the Static-99-R is 8.3% (358 out of 4325), and 3.5% (35 out of 987) for the ISORA. (*See* Exs. 61 at 17 (Fig.24)(ISORA); 71 (Static-99)). An individual's score places him in a risk category ranging from low to high, at, above or below the base rate. Mr. Zarbano was assessed as part of his SOTP participation. Before treatment he scored as a "Low-Moderate" risk on the Static-99-R with a 7.1% recidivism rate. (Exs. 55, 72). Mr. Gamble, whose SOTP participation is far in the future, has yet to be assessed for the program, but Randy Cole, an experienced sex offender treatment professional, just before trial scored Mr. Gamble as a "Moderate-High" risk on the Static-99-R with a 10.1% recidivism rate. (Exs. 42, 72). That will reduce to "Low- Moderate" when Mr. Gamble reaches age 40 in 2017.

As noted, these risk scores are pre-treatment. The testimony was uniform that successful completion of the SOTP significantly reduces the risk of sex abuse reoffending. The IDOC Director of Research, Lettie Prell, in 2010 conducted a statistical validation study of the ISORA and Static-99. (Ex. 61).[6] The effectiveness of sex offender treatment is reflected in the ISORA

---

[5]  Unlike the Static-99-R, the ISORA includes female sex offenders though the number of female sex offenders in Iowa is comparatively very small. (*See* Ex. 61 at 20).

[6] Ms. Prell's study included that while some revisions were in order, the ISORA and Static-99 were "good to excellent" predictors of new convictions for a sex offense. (Ex. 61 at 3).

factors. The ISORA includes a "Treatment Risk Factor" which assigns a value of "0" for successful treatment, "1" for partially successful treatment, and "3" for no treatment or unsuccessful termination (the lower  the score the lower the risk). (*Id.* at 18). Ms. Prell testified the different values recognize that statistically the recidivism rate is roughly three times higher for those who do not successfully complete the SOTP.[7] (*See id*. at 11 (Fig. 11)).

The SOTP is an intense, cognitive treatment done primarily through group counseling and individual counseling as needed, in which the offender reviews his life, identifies red flag behavior, and learns methods to stop the cycle of deviancy. Mr. Cole testified that, as much as possible, the SOTP is individualized for the offender. Sex offenses are underreported crimes. Gail Huckins, the Interim Superintendent at MPCF, who has experience overseeing the SOTP, explained that in her experience it is rare that an offender has only one victim. Honest disclosure by the offender of the extent of his deviant sexual behavior is essential to successful treatment and a cornerstone of the program. Like many offenders, when Mr. Zarbano began the SOTP he denied responsibility for his conviction even though he pleaded guilty. He testified that through SOTP, he learned to take charge of his thinking and the way he makes others feel so he could stay out of situations that lead to bad thoughts for him. Mr. Gamble to this point has also denied responsibility for his crime which, if he persists, will likely result in unsuccessful treatment.

Because the IDOC does not place offenders in the SOTP until they are near their discharge dates, offenders with long sentences like Mr. Gamble must wait many years to participate. If the offender has been convicted of a sex offense with a minor, IDOC policy may

---

[7] According to the testimony of plaintiff's expert, Dr. Rosell, and Mr. Cole, if a sex offender reoffends, a subsequent offense is likely to occur relatively soon after release, within the first year or two (Dr. Rosell) or within five years (Mr. Cole).

prohibit all contact between the offender and his minor child for many years until successful completion of the SOTP, in Mr. Gamble's case until J.D. reaches adulthood.

## II.  DISCUSSION

### A.      Preliminary Issues

1. Qualified Immunity

Though the focus of plaintiffs' claims for relief at hearing and in post-trial briefing has been on equitable relief for Mr. Gamble, the Amended Complaint seeks nominal damages for both plaintiffs, and Mr. Zarbano continues to press for nominal damages. (Amend. Compl. [33] at 16; Pl. Post-Trial Brief [89] at 50). Defendants plead and argue qualified immunity from suit for damages. (Amend. Ans. [38] at 4; Def. Post-Trial Brief [88] at 23-25).

"Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Hungerford*, 23 F.3d 1450, 1452 (8th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Lykken v. Brady*, 622 F.3d 925, 929-30 (8th Cir. 2010). The doctrine, when applicable, is more than an affirmative defense. It protects a defendant from suit and hence qualified immunity must be addressed as an initial matter. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)(qualified immunity is question of law for the Court to answer). Under this standard, there is "ample room for mistaken judgments," and "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks and citation omitted). "Qualified immunity involves the following two-step

inquiry," and the Court need not address the steps in a particular order: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). "'If either question is answered in the negative, the public official is entitled to qualified immunity.'" *Hall v. Ramsey*, 801 F.3d 912, 917 (8th Cir. 2015) (quoting *Vaughn v. Ruoff*, 253 F.3d 1124, 1128 (8th Cir. 2001)).

For present purposes, the Court will assume plaintiffs have sufficiently shown the prohibition on all contact with their children in plaintiffs' individual circumstances violated plaintiffs' liberty interest in maintaining a relationship with their children protected by the Fourteenth Amendment, and their right to familial association protected by the First Amendment. *See Wirsching v. Colorado*, 360 F.3d 1191, 1198 (10th Cir. 2004)(citing relevant case law (the quotation from the concurring in part and dissenting in part opinion in *Hodgson v. Minnesota*, 497 U.S. 417, 484 (1990) was authored by Justice Kennedy, not Justice Scalia as attributed in the citation, and is at page 484)). The second question in the qualified immunity inquiry must, however, the answered in the negative.

A public official's conduct violates clearly established law when, at the time of the conduct, "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right'". *Ashcroft v. Al-Kidd*, 563 U.S. 731, ___, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There need not be case law directly on point, "but existing precedent must have placed the . . .

constitutional question beyond debate." *Id.* The contours of plaintiffs' right to contact their minor

children while incarcerated were not sufficiently clear for three related reasons.

First, the law is unsettled concerning whether and the extent to which an inmate's First

Amendment right of association survives incarceration. In *Overton v. Bazzetta*, 539 U.S. 126

(2003), a prison visitation case, the Supreme Court declined to "explore or define" an inmate's

right of association or to "determine the extent to which it survives incarceration" because

explication was not necessary to determination of the case before the court. *Id.* at 131-32. The

court was careful to note that in passing the opportunity it did not mean to hold or imply that any

such right did not survive incarceration. *Id.* There has been no more definitive guidance from the

Supreme Court on the subject, or from our Court of Appeals, since *Overton*.

Though not the focus of the parties' arguments, the restriction on Mr. Gamble's ability to

communicate by mail with J.D. potentially implicates a more extensive body of case law. In

general, a prison inmates retains a First Amendment free speech right to send and receive mail,

subject to reasonable regulation. *See Thornburgh v. Abbott*, 490 U.S. 401, 409-14 (1989);

*Procunier v. Martinez*, 416 U.S. 396, 409 (1974); *Kaden v. Slykhuis*, 651 F.3d 966, 968-69 (8th

Cir. 2011).

Second, whether prison regulations which restrict inmate constitutional rights survive

challenge is subject to the four-factor analysis laid out in *Turner v. Safley*, 482 U.S. 78, 89-91

(1987). *See Overton*, 539 U.S. at 132 (applying *Turner*); *see infra* at 19 (quoting *Turner* factors).

Except in obvious circumstances, or where clear precedent informs conduct, consideration of the

*Turner* factors is unlikely to lead every reasonable official to the correct result. Particularly is

that the case here where *Turner* requires weighing a claimed right to associate with a child

against the potential effect the exercise of that right may have on the rehabilitation of an inmate convicted of sexually abusing a child. Moreover, there is precedent in this Court involving some of the same defendants which, while factually distinct, may have been seen as supporting the constitutionality of defendants' more recent conduct in banning Mr. Gamble from all contact with J.D. In granting summary judgment on the ground of qualified immunity in *Lemon v. Baldwin*, 4:12-cv-00364-JAJ-CFB (5/13/2013 Order [15])(hereinafter "*Lemon* Ruling"), Judge Jarvey upheld the regulations in question when employed to ban all contact between an inmate convicted of sexually abusing his twelve-year-old foster daughter and the inmate's former wife and minor children where the wife and minor children had resided in the same household in which the abuse occurred. The Court concluded the ban was "reasonably related to legitimate penological interests, and defendants did not violate Lemon's constitutional rights." *Lemon* Ruling at 6.

Finally, the limited existing relevant precedent simply does not place the constitutional question here beyond debate.

Defendants have qualified immunity from suit for damages.[8]

---

[8]    In the absence of any claim for damages it is not necessary to examine the responsibility, or lack of responsibility, of each individual defendant for the constitutional violations alleged.

There is another reason Mr. Zarbano cannot recover damages. He has not shown that any restrictions on his ability to contact his children in fact interfered with his right to associate with them. He has lost contact with his children, does not know where they are, there is no evidence the children would have wanted to communicate with him, or that their mother (or other current guardian) would have permitted contact. *See Morgan v. Huckins*, 4:11-cv-00262-JEG-CFB (2/11/2013 Order [46])(dismissing similar inmate action for lack of standing where no evidence any child of defendant attempted to visit or correspond with inmate).

2.  Mootness – Mr. Zarbano

Mr. Zarbano has been released from prison. His requests for injunctive and declaratory relief are therefore moot. *See Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 835 (8th Cir. 2009)(inmate's claims for injunctive and declaratory relief moot where inmate is transferred to other facility and no longer subject to the allegedly unconstitutional conditions). There is no reason to believe Mr. Zarbano will commit another sex abuse offense subjecting him to the prison regulations of which he complains. Indeed, the statistical data discussed above would indicate it is unlikely he will reoffend. It follows his case does not fall within the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine. *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)(discussing exception).

3.  Standing – Mr. Gamble

Citing *Overton*, defendants maintain that Mr. Gamble lacks standing to bring his claim because his parental rights were terminated. *Overton* was a class action which mounted a top to bottom challenge to Michigan prison regulations which limited eligible visitors in order to permit better supervision and control by prison officials. 539 U.S. at 129-30. One of the many challenged limitations was the exclusion of visits by children of inmates if the inmate's parental rights had been terminated. The Supreme Court upheld the limitation in a single sentence: "The prohibition on visitation by children as to whom the inmate no longer has parental rights is simply a recognition by prison administrators of a status determination made in other official proceedings." *Id.* at 133. It is apparent from the court's opinion that it viewed the regulation as a reasonable means to further the valid interest in promoting internal security by reducing the number of child visitors and the disruption they caused. The court's statement should not be

taken as a blanket holding that prison inmates have no constitutional right to visits from a child with respect to whom the inmate's parental rights have been terminated. Nor was standing an issue.

The IDOC does not have a regulation like Michigan's. Defendants have not claimed that denying Mr. Gamble visits with J.D. promotes any interest in reducing the number of child visitors. Beyond this, it is appropriate to look to the reality of the relationship. Though he has surrendered his legal rights under state law to act as J.D.'s parent, Mr. Gamble is J.D.'s biological father. J.D., her mother, and Mr. Gamble desire him to have a parental role in fact, if not in law.[9] Mr. Gamble consented to the termination of his parental rights with the understanding he would continue to have a role in J.D.'s life. The Court does not believe the "status determination" terminating Mr. Gamble's parental rights should be seen as completely erasing all First Amendment rights he may have to associate or communicate with a mature daughter who wants a relationship with him.[10]

## B.     The Merits – Mr. Gamble

Though the parameters are undefined in the case law, the Court concludes that Mr. Gamble has a First Amendment right to familial association with his daughter, and a liberty

---

[9]  From Ms. Davey's testimony and the history of Mr. Gamble's relationship with J.D. it is reasonable to infer J.D.'s stepfather has no objection to Mr. Gamble's contacts with her.

[10]  Defendants also cite an unpublished Iowa Court of Appeals decision, *In re C.J.*, 674 N.W.2d 685, 2003 WL 22701266 (Iowa App. 2003) (Table) for the proposition that " [a]n inmate cannot assert constitutional rights with respect to a minor from whom he has terminated his parental rights." The court said nothing of the kind. The opinion does not talk about constitutional rights between an inmate whose parental rights were terminated and his minor children. The case was a garden-variety appeal of a termination of parental rights by an inmate who argued he consented under duress caused by the stress of being in prison.

interest in maintaining a relationship with her subject to Fourteenth Amendment due process protection. *See Wirsching*, 360 F.3d at 1198; *Stojanovic v. Humphreys*, 309 Fed. Appx. 48, 50-51 (7th Cir. 2009). As a sex offender whose victim was a minor, IDOC regulations, as they have been applied to Mr. Gamble, together with the length of his sentence and inability to participate in the SOTP until near discharge, have combined to prohibit him from all contact with his 16-year-old daughter until she becomes an adult.  The regulations thus impinge on the constitutional rights noted. A prison inmate, however, "does not retain rights incompatible with incarceration" and "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977)).

The prohibition on Mr. Gamble's contact with his daughter is valid if "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In *Turner* the Supreme Court identified four factors relevant to the inquiry:

> . . . whether the regulation has a " 'valid, rational connection' " to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation.

*Overton*, 539 U.S. at 132 (citing and quoting *Turner*, 482 U.S. at 89-90).

The legitimate penological interests put forward by defendants which the regulations at issue are claimed to serve are inmate rehabilitation and the protection of public safety. There is no question about the legitimacy of these interests, and they are related. Sex offender rehabilitation is achieved by successful completion of the SOTP, and an inmate who has successfully completed the program is much less likely to commit a sex offense again.

"Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism." *McKune v. Lile*, 536 U.S. 24, 33 (2002).

Defense witnesses Mr. Howard, Ms. Roche, Mr. Cole, Mr. Bartruff and Dr. Tatman testified to the reasons for prohibiting all contact between Mr. Gamble and his daughter. In substance, defendants maintain that until the extent of Mr. Gamble's sexual misbehavior and pattern of deviancy become known through treatment he should not have contact with J.D. Until then Mr. Gamble's contacts with her may perpetuate deviant behavior by allowing him to groom J.D. as a potential victim[11] and trigger sexual fantasy. Both may impede rehabilitation and risk harm to J.D. Also, treatment becomes more difficult the longer Mr. Gamble remains in denial about his crime and sexual deviancy, a denial J.D. and her mother reinforce by acceptance of his claim of innocence. Finally, defendants argue Mr. Gamble's non-contact with his daughter is an incentive for him to successfully complete the SOTP.

Applying the *Turner* factors, the Court concludes the application of IDOC's regulations to prohibit all contact between Mr. Gamble and his daughter does not withstand constitutional scrutiny. For two reasons it is best to start with the mail restriction. First, the connection to the penological interests involved is admittedly more attenuated. The defense witnesses who testified on the subject were uniform in saying correspondence poses less risk to achieving the purposes of the regulations than in-person contact. Indeed, the regulations recognize this in allowing sex offenders to write to minors within the immediate family unless the minor victim was a member

---

[11] Ms. Roche testified that "grooming" is a pattern of behavior with a minor in which the perpetrator attempts to gain trust in order to violate boundaries.

of the immediate family, whereas visitation and telephone calls are prohibited regardless of whether the victim was in the immediate family. (*See* Ex. 64). Second, if the prohibition on communication with J.D. by letter cannot be sustained, that opens an alternative which affects the analysis of the visitation and telephone call restrictions. In *Overton* the Supreme Court said if no alternative means of communication existed other than visitation, that fact would be "some evidence" that the challenged regulations limiting visitation were unreasonable, but communication by letter and telephone gave inmates an alternative means of associating with persons prohibited from visiting. 539 U.S. at 135. Regulations which leave an inmate with no alternatives to maintain a relationship with his children "may survive constitutional attack if the other three [*Turner* factors] weigh heavily in favor of . . . constitutionality. *Stojanovic*, 309 Fed. Appx. at 51-52.[12] In this case the other three factors do not weigh heavily in favor of constitutionality.

The relationship between prohibiting Mr. Gamble from writing to his daughter and the legitimate penological interests of rehabilitation and public safety is not very strong. J.D. is not a victim. Mr. Gamble only saw her briefly on one occasion when she was an infant with her mother present. Mr. Gamble's crime did not occur in the same household in which J.D. resided. Neither J.D. nor her mother could have been personally affected by his crime. Mr. Gamble will have no unsupervised contact with J.D. until at the earliest 2027 when J.D. will be 28 years old. Similarly, with release so far away grooming J.D. as a potential child victim is impossible. If Mr.

---

[12] In *Stojanovic* the inmate, who had raped an adult woman at knifepoint and in treatment admitted to raping two children, was not allowed to visit with his minor daughter and a niece. 309 Fed. Appx. at 50-51. It was not clear if the inmate could communicate with the children by letter or telephone. Id. The Seventh Circuit's decision was issued as an "order" which means it is not precedential in the circuit. Seventh Circuit Rule 32.1; see Fed. R. App. P. 32.1.

Gamble has a sexual attraction to children, there are plenty of stimuli in the prison environment more likely to invite sexual fantasy (movies, television, magazines and the like).

The correspondence between Mr. Gamble and J.D. in the record contains no sexual references or innuendo.[13] Mr. Gamble has sent gifts to J.D., and to her mother. His letters refer to a purse, belt and a jewelry box all of which he apparently made in prison and sent as birthday or Christmas gifts. Viewed in context, the few references to the gifts appear innocent, not an attempt to gain trust as a prelude to sexually abusing J.D.

If Mr. Gamble's successful participation in the SOTP is more difficult the longer he is in denial about his crime, that is largely a consequence of the policy of deferring treatment of a sex offender until close to release. Denial is common. Treatment efforts to overcome it in Mr. Gamble's case are far in the future. An ability to exchange correspondence with J.D. before she reaches adulthood is unlikely to reinforce Mr. Gamble's obduracy if, as the parties have stipulated, after J.D. reaches eighteen years of age in 2017 IDOC policies will not restrict visitation, correspondence or telephone calls with Mr. Gamble. Similarly, it is difficult to see that no contact with J.D. now is an incentive for Mr. Gamble to successfully complete the SOTP twelve years hence.

Without the ability to visit or speak with J.D., the ban on correspondence leaves no alternative open to Mr. Gamble to associate or communicate with his daughter until she is eighteen. He has been told not to communicate with J.D. through her mother. Accommodating

---

[13] In a November 14, 2014 letter J.D. said she had asked her mother if she could get a tattoo on her shoulder with the message "my love is a Gamble." She wrote that her mother had laughed and told her "no." (Ex. 39 at 6). Nothing in her letters (or Mr. Gamble's) suggests the reference had a sexual connotation.

Mr. Gamble's right to maintain a relationship with his daughter through correspondence would have no impact on guards or other inmates because prison security is not implicated. There would also be no impact on the allocation of prison resources unless prison officials elected to closely monitor Mr. Gamble's correspondence with his daughter, which leads to the last factor.

An obvious, easy alternative to a complete ban on correspondence is monitoring the correspondence by a designated official for concerning content; grooming or other references betraying a sexual interest in J.D. or children generally, or which could reasonably be seen as discouraging Mr. Gamble's future participation in the SOTP. The Court can appreciate prison officials do not have the resources to monitor all inmate mail, but they do have the resources to monitor some mail. Defendants do not assert there are numerous other inmates banned from all contact with their children who might burden officials with similar requests for accommodation; inmates with long prison sentences for child sexual abuse who will not receive treatment for many years, who want to correspond with a minor child who was not a victim and was not in the same household as the victim, where the child wants to correspond and the child's parent or guardian supports the correspondence. Reasonable limitation could be placed on the frequency of correspondence. Accommodating Mr. Gamble's right to associate with his daughter to maintain a relationship with her by the few minutes necessary to review occasional correspondence would be "at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 90-91.

Turning to visitation and telephone calls, IDOC rules prohibit visitation with minors for sex offenders whose victim was a minor until successful completion of the SOTP, and telephone calls with minors though exceptions may be approved. (Exs. 64, 77-1). As a general proposition it is rational to believe an untreated inmate with a sexual attraction to children ought not to have

direct, in-person contact with a child by visitation or telephone until the extent of the inmate's sexual deviancy is revealed in the course of treatment, and the inmate is equipped with coping mechanisms to control behavior. Until then, the Court accepts that in-person contact may impede rehabilitation and pose a risk to the child for the reasons given by defendants. Still, the connection to those interests, if more proximate than with mail, is not compelling in Mr. Gamble's particular circumstances as discussed above. The Court nonetheless concludes the regulations denying sex offenders with minor victims the opportunity for visits with minors (including their own children)  until the offender completes the SOTP, and from telephone calls with minors, has a valid, rational connection to the legitimate penological interests of rehabilitation and public safety. *See Lemon* Ruling at 6.

If, as the Court will direct, Mr. Gamble will be allowed to exchange correspondence with J.D., he will have an alternative means of exercising his right to associate with her. In fact, mail has been the primary means by which Mr. Gamble as maintained a relationship with his daughter while in prison. There is a record of only one visit from Ms. Davey presumably accompanied by J.D. (Ex. 17), and there will be no more until Thanksgiving 2016. Mr. Gamble testified he was only infrequently able to talk to J.D. on the telephone, once every few months when he had the money.

As with mail, allowing Mr. Gamble to occasionally talk on the telephone with J.D. and to have one visit with her before she is eighteen would have no impact on guards or other inmates, and none on prison resources unless prison officials elect to more closely monitor visitation and telephone calls than they would ordinarily. Heightened monitoring is the ready alternative to a complete ban on visitation and telephone calls. Such monitoring in the form of special

supervision (or no contact visitation), or listening to phone calls would have some impact on prison resources, but the infrequency of these contacts diminishes the cost to penological interests.

On the issues of visitation and telephone calls with minors the *Turner* factors thus cut both ways. The first factor, the relationship to a legitimate governmental interest, weighs more heavily in the balance. It is "foremost." *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001). This together with the "substantial deference" the Court must accord to the professional judgment of prison administrators, *Overton*, 539 U.S. at 132, leads the Court to conclude that the IDOC regulations which restrict Mr. Gamble's ability to have visits and telephone contact with J.D. are reasonably related to legitimate penological interests if Mr. Gamble is able to associate with J.D. by correspondence. The Court will not require defendants to permit visitation or telephone calls between Mr. Gamble and J.D.[14]

---

[14] The Court would be reluctant in any event to issue an injunction requiring prison officials to allow Mr. Gamble to have visitation with J.D. at Thanksgiving in 2016. An injunction is an extraordinary remedy not to be granted lightly. 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2942 at 44 (2013)("Wright and Miller"). As an equitable remedy the Court has discretion whether or not to issue an injunction and it "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Typically the decision involves an assessment of the injury involved and a balancing of interests. Wright and Miller at 40. The injury and hardship to Mr. Gamble do not weigh heavily if he is unable visit J.D. at Thanksgiving 2016 in view of the fact prison regulations will not prohibit J.D. from visiting Mr. Gamble about three months later when she turns eighteen. Essentially, the Court is asked to grant an exception to the visitation policy to accommodate the travel plans of Ms. Davey and J.D. In view of the public interest involved, that is not a sound reason to invoke federal injunctive relief.

### III.   RECOMMENDATION AND ORDER

Consistent with the foregoing discussion, it is respectfully recommended that judgment be entered as follows:

(1)     Dismissing all claims of plaintiff Jene Zarbano;

(2)     Granting plaintiff Byron Gamble a mandatory injunction requiring defendants to permit him to correspond with his daughter J.D. subject to reasonable limitations on frequency, and increased monitoring which defendants may elect to employ. Defendants should be required to advise the Court within twenty (20) days following entry of judgment if they wish to limit frequency or monitor mail between Mr. Gamble and J.D. beyond normal prison policy for inmate mail. If so, counsel should be directed to, within a specified time frame, confer, prepare a proposed protocol, and submit the same for incorporation in a supplemental decree.

(3)     Dismissing all claims of plaintiff Byron Gamble for damages or for other equitable relief.

IT IS ORDERED that the parties have until **January 15, 2016** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994);

*Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 23d day of December, 2015.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE